DUNHAM, *appellant*, and JACKSON, *respondent*.

On a bill to *redeem*, stock, alleging that the same had been pledged for $500, an answer that the stock was pledged for $800, in addition to the $500 alleged in the bill, was held to be responsive to the bill, and not the setting up of a *distinct* and *new matter*, in avoidance of the equity admitted by the answer ; and that the answer must prevail against the evidence of a single witness, unsupported by other witnesses, and uncorroborated by circumstances.

Where the parties came together for the purpose of redeeming the stock pledged, and a broker attended to receive a re-assignment of the stock, and to pay what should be found to be due to the pledgee, and the broker, after the amount was agreed upon, being requested by the agent of the pledgor to draw his check for the amount, took out of his pocket-book a blank check for the purpose of filling it up, was interrupted by the pledgee observing let it be done to-morrow, and demanding that the whole value of the stock, being about $700 more than the amount liquidated, should be paid to him, under the pretence that he was responsible as surety for the pledgor, on another and separate account, *it was held*, that these circumstances did not amount to a *tender*.

The bare *refusal* to receive the sum due, and the demand of a larger sum, is not enough to excuse the *actual tender* of the money.

Where a party is entitled to redeem, the proper decree is that the complainant have the privilege to do so, and not that the bill be dismissed ; if the latter decree be entered after a hearing upon the merits, all future claim to redemption is barred.

APPEAL from chancery. The appellant filled a bill in chancery, alleging that on the 22d February, 1827, she, *by*

*her agent*, D. S. Griswold, borrowed of the respondent $500 and to secure the payment, thereof she, *by her said agent*, assigned to the respondent 40 shares of Williamsburgh Ferry Company stock, of the nominal value of $50 per share, and delivered to him a certificate of the stock assigned ; that she had tendered to the respondent the full amount of the principal and interest of the debt, and requested a re-assignment of the stock, which was refused ; and after averring a readiness and willingness to pay, she prayed a decree that the respondent might be compelled to re-assign ; and that in the mean time he be restrained by injunction from conveying away the stock. The respondent, in his answer, stated that on the 22d February, 1827, he made a loan of $500 to *D. S. Griswold*, and admitted that he received a certificate of transfer of the 40 shares of stock, but that such transfer was made not only a security for the $500 then advanced, but *also* for monies previously lent by him to Griswold ; and that the loans made by him to Griswold amounted in the whole to $1300,64. The respondent further stated in his answer that Griswold never intimated to him that in obtaining the loan of the $500 he acted for or in behalf of any person other than himself, nor had he any knowledge until several days after the loan of the $500 that the stock was the property of any other person than Griswold, when on examining the books of the Williamsburgh Ferry Company he ascertained that the 40 shares of stock had been transferred to him by the appellant. Griswold was examined as a witness, and testified that he was the general agent of the appellant, and managed all her pecuniary matters ; that the loan of the $500 was made to the appellant, he, the witness, acting as her agent in the transaction, and informing the respondent that the loan was for her benefit, to enable her to pay off several small accounts owing by her ; that the money was paid to him, the witness, in several parcels, for which he gave acknowledgments in his own proper name, without specifying either in the body of the acknowledgments or in the signature, that it was received by him as *agent*, although such was his ordinary practice when he received money for the appellant ; but that it was possible that in cases where he

had acted for a long time to the knowledge of the party he dealt with as agent for the appellant, the agency expressly in writing may have been forgotten or omitted, as was the case in the transaction with the respondent. Previous to the filing of the bill the appellant made a *tender* of the $500 with the interest thereof, which the respondent refused to accept. Also, at another time, previous to the filing of the bill, the respondent and Griswold had a meeting for the purpose of closing the concern relative to the stock, and a broker of the name of *Tracy* attended to receive the assignment, to enable him to fulfil a contract made by the appellant. There was much conversation between the respondent and Griswold on the subject. Previous to the assignment of the 40 shares of stock there had been 11 other shares of the same stock assigned, belonging to the appellant, by Griswold, to the respondent, so that he held 51 shares in the whole. Griswold in the hearing of D. R. Dunham, a brother of the appellant, to expedite the business, proposed to the respondent, "suppose you transfer to Mr. Tracy 40 shares, and he will pay you $500 ;" the respondent objected to doing so, saying that he wanted to settle the whole account. After some altercation between the respondent and Griswold as to the amount due, Griswold agreed to pay the respondent the amount of his claim, which the witness said was about $1300, and requested *Tracy* to draw a check for the amount. Tracy took out of his pocket-book a *blank check* for the purpose of filling it up. Griswold observed to the respondent, you will make the transfer to Mr. Tracy, and he will pay you the money. The respondent hesitated a little, and then observed to Mr. Tracy, let it be done to-morrow ; whereupon Tracy left the parties, he having attended for the purpose of paying what should be found due to the respondent, and testifying that he would have paid to the amount of $2000, had he been requested so to do by Griswold. Griswold asked the respondent why he did not transfer the stock to Tracy, the respondent answered that he was surety for the appellant in a replevin bond, and that he wished to be indemnified, and that he would not re-assign the stock unless he received the whole amount for which it was agreed to be sold by the ap-

ALBANY,
Dec. 1830.

Dunham
v.
Jackson.

pellant, which was $40 per share. After the proofs were closed and the cause noticed for hearing the appellant presented a petition to the chancellor, stating that the stock had greatly depreciated since the time of the *tender*, and since the commencement of the suit, and praying that it might be referred to a master to enquire what amount of depreciation the stock had undergone. Which reference was accordingly made, and the master was further directed to report the several amounts due from the appellant, and from Griswold to the respondent, for advances made as alleged in the answer. The master reported that there was due from the appellant $552,34, and from Griswold $609,57; that at the time of the filing of the bill the stock (which bore a nominal value of $50 per share) was worth 76 cents on the dollar, or seventy-six per cent, and that at the date of his report it was worth nothing. The respondent excepted to the master's report, because the $500 loan was charged to the appellant and not to Griswold, and also objected to the amount of depreciation reported by the master.

The chancellor *decided* that the transfer of the 40 shares of stock was made to secure the payment of the whole amount advanced by the respondent to Griswold, and *decreed* that the appellant have leave to redeem the stock within three months, upon paying the several sums reported by the master, together with the respondent's costs; and that upon payment of the same, the respondent assign as well the 40 shares of stock as the 11 shares first transferred; and in case of default in the payment that the bill be dismissed, and that the appellant be forever barred from redeeming the stock, and that she pay the costs of the suit in chancery. The following opinion was delivered:

By the CHANCELLOR. The answer of Jackson, as to the transfer of the stock in security for all the sums advanced, is responsive to the bill, which in substance charges that it was assigned to him as security for the five hundred dollars only. In this point it is contradicted by the deposition of one

witness, who testifies under circumstances which are not calculated to throw any particular weight into the scale in opposition to the answer beyond the unsupported testimony of one whose feelings at least are strongly interested against the defendant.    There is nothing in the other testimony in the cause to destroy the credit of the answer.    I must therefore declare that the transfer was made to secure the whole amount advanced, and that the complainant is not entitled to redeem without paying the whole sum and interest.    There has been no legal tender or valid offer to pay the whole amount sufficient to conclude the defendant.    There must therefore be a decree authorizing the complainant to redeem the whole amount of stock at any time within three months after the date of this decree, on her paying to the defendant the two several sums of $552,34 and $609,57, with interest thereon from the date of the master's report, and the defendant's costs in this cause to be taxed.    And if she shall not redeem the same within the time aforesaid, that then the bill in this cause be dismissed with costs, and her right to redeem the same be forever barred.    The conclusion at which I have arrived renders the exceptions immaterial, as the stock was pledged for the payment of the whole amount without any knowledge on the part of Jackson that the complainant had any interest in the stock or money, it is perfectly immaterial what part, if any, was applied to her use.

The complainant below appealed, and the cause here was argued by

*R. Sedgwick*, for the appellant, and by

*J. O. Grim & S. A. Foot*, for the respondent.

Points raised on the part of the appellant :

1. There ought to have been a decree in favor of the appellant, and that the respondent pay the amount of the depreciation of fifty-one shares of stock, as reported by the master, with costs.

2. The answer of the respondent was not competent to establish a claim in his favor, for any particular amount beyond the five hundred dollars mentioned in the bill.

3. If it was proper to render any decree against the appellant, it should have been simply that the bill be dismissed with costs, but without prejudice to the rights of the appellant.

4. The tender or offer of payment of the whole amount of the account of the respondent was sufficient.

5. At all events, the decree ought to have left it open to the appellant to show a right to redeem, on the payment of any sum beyond five hundred dollars, according as the rights of the appellant might be made to appear.

Points urged on the part of the respondent:

1. The respondent's answer fully and explicitly sets forth the fact, that the forty shares of stock in question were received as security for the general indebtedness of Daniel S. Griswold to the respondent, and that they were not received, as alleged in the bill and testified to by Griswold, as security only for the $500 borrowed on the 22d February, 1827.

The respondent's answer also sets forth the facts fully and clearly, that the loan of the $500 made on the 22d of February, 1827, was made to and for the said Griswold, and that he did not know that it was made for the benefit of the appellant; that he believed the forty shares of stock were the property of Griswold, and that he did not learn that they belonged to the appellant until some time after the moneys he loaned to Griswold had been advanced to him.

2. The answer is contradicted by only one witness, viz. Griswold; and the accompanying circumstances, instead of corroborating, lead to a disbelief of his testimony.

3. If the shares were received to secure the general balance due from Griswold to the respondent for money loaned, then the decree of the court of chancery must be correct.

The following opinion was delivered:

By Mr. Justice MARCY. The bill in this case was filed for the redemption of forty shares of stock, pledged or transferred to the respondent, as security for the payment of a loan of $500. In the answer the respondent admits that he holds the stock as a pledge, but denies that it is for the loan of the $500 alone; he says it was pledged for the repayment of that sum and about $800 more, being the amount of several loans antecedent to that charged in the bill. The pledge was effected through the agency of Daniel S. Griswold, and a question is now raised as to his power to pledge for any other loan than that for $500, which was made for the benefit of the appellant; the other loans for which the respondent pretends to hold the stock were made on Griswold's individual account. The agency of Griswold is stated in the bill, and the respondent is charged with knowing it; but the respondent in his answer positively denies such knowledge, and affirms that Griswold did not inform him that the stock belonged to the appellant, or that the loan was on her account; he made the loan, he says, to Griswold individually, and took the stock as his property, without any knowledge or belief that it belonged to the appellant.

It was asserted on the argument, that the question as to Griswold's power to pledge the stock for any sum beyond $500, was not agitated in the court below; if so, it ought not to be raised here. That matter does not seem to have been in litigation there; nothing is said about it in the chancellor's opinion, nor does the proof in the case bear upon the question. The testimony, however, shows that Griswold was an agent of the most general character; he had the entire charge of the appellant's pecuniary concerns, and managed them without any very special direction from her. He was also the secretary of the Williamsburgh Ferry Company, and brought the certificate of the stock to the respondent with his name therein inserted. His right to transfer is not questioned, and, if it was given with restrictions, that should have been clearly shown before it could be set up to the prejudice of the respondent. By giving Griswold

power to transfer the stock, and thereby enabling him to exhibit himself in the light of the absolute owner, the appellant put him in a situation to practice a fraud ; and if he has done so, she is to suffer thereby, rather than a *bona fide* purchaser. If, therefore, we were at liberty to entertain the question as to Griswold's authority to pledge the stock to the extent and for the purpose the respondent contends he did, we should find no difficulty, I apprehend, in determining that the appellant cannot avail herself of his want of authority without bringing home to the respondent notice of Griswold's abuse of his agency. Knowledge that the stock was the property of the appellant is explicitly charged in the bill, and positively proved by the testimony of Griswold ; and the denial in the answer is as explicit and positive. The testimony of Griswold, unsupported by any other witness, and uncorroborated by circumstances, cannot establish, in opposition to the denial of the answer, that the respondent had knowledge that Griswold was acting as the agent of the appellant in making the pledge of the stock. If it should appear, therefore, that the pledge was a security for all the loans instead of the $500, the appellant cannot have the stock re-assigned to her by paying that sum, on the ground that Griswold had no authority to pledge it for more.

Assuming that the answer in relation to the sums of money for which the stock was pledged is responsive to the bill, or so much so, as to make it evidence for the respondent (and whether it is or not, I shall presently examine) is it disproved ? All there is to disprove it, is the testimony of Griswold, which of itself cannot outweigh the answer. There is nothing in the other testimony or in the circumstances to add to its strength on this point ; on the contrary, I think they are rather corroborative of the answer. When the $500 were paid, acknowledgments were given by Griswold in his *own name*. This he admits was contrary to his usual mode of doing the appellant's business ; his practice was to add the word *agent* to his name when he signed writings as her agent, and the reason for not doing so in this instance is not very satisfactory. Though this fact does not bear upon the precise point as to the extent of the pledge, yet it well ac-

ALBANY,
Dec. 1830.

Dunham
v.
Jackson.

cords with the respondent's account of the transaction, and is somewhat inconsistent with that set forth in the bill. When there was an attempt to adjust this matter in the presence of D. R. Dunham and F. A. Tracy, Griswold does not appear to have asserted, as it was natural he should do, that the pledge was only for the $500. There was considerable angry conversation between him and the respondent on that occasion, particularly when the latter insisted upon retaining the shares of stock to indemnify himself for what he might be obliged to pay as security for the appellant in a replevin suit. If Griswold had made up his mind to yield to the first exaction in extending the pledge over the loans antecedent to that for $500, he would have been likely to advert to this unfair conduct when another claim was set up by the respondent to be adjusted before he would consent to transfer the stock. I do not consider Griswold's remark to the respondent, as testified to by Dunham, " suppose you transfer to Mr. Tracy the forty shares, and he will pay you the $500," when taken in connection with the reply, as making out a distinct assertion that the pledge was for $500 only. To that proposition the respondent objected, and said he wanted to settle the whole account. This objection was not attempted to be removed, as it was very natural it should have been if the pledge applied only to the $500, by an allegation from Griswold that that sum was all for which the pledge was given. The statement in the answer that the pledge was for $1300 instead of $500, is not disproved; and it must be considered as establishing that fact, if this part of it is proof against the appellant. The chancellor viewed it in that light, and made it in part the foundation of his decree.

It is said, on the part of the appellant, that the answer, by setting up a claim to retain for a sum beyond the $500 specified in the bill, introduces new matter, not responsive to the bill, and in avoidance of its equity. The rule on this subject, as I understand it, is, that when an answer admits a distinct fact which goes to charge the defendant, and alleges another not responsive to the bill, by way of discharge or avoidance of that admitted, the latter is not established by the answer. If a guardian or trustee is called on to account,

and in his answer admits a sum of money to have been received, and then proceeds to shew the appropriation of it, what he says about the appropriation, unless that and the receipt of it can be regarded as parts of a single transaction, is not evidence in his favor. · The case which most aptly illustrates, and goes the farthest to sustain the position for the appellant, is that of *Green* v. *Hart,* 1 *Johns. R.* 580. One Johnson had given his note to Green, which was accompanied by a mortgage as security. Green endorsed the note to Hart, and at the same time delivered to him the mortgage. Hart filed his bill, stating the above facts, and .alleging that he paid a full and valuable consideration for the note and mortgage, and prayed that the money due on the note might be paid, or the premises sold. The answer set up usury in the consideration for the assignment of the note. One of the questions was whether usury in the transfer of the note was established by the answer. The ground taken by the appellant was that the respondent having set forth in his bill that the transfer was for a full and valuable consideration, the answer setting up usury was responsive to that charge, and therefore adequate proof of the usury. This view of the case is answered by Spencer, justice, who delivered the unanimous opinion of the court. He considered that Hart had unnecessarily inquired into the consideration of the transfer ; but as he had done so, Green might have denied it, and then Hart would have been put to his proof. If it was incumbent on him to establish that fact, without proof of it, he would have failed in his suit. The burden of shewing that the consideration was illegal or inadequate rested on Green. When he made a charge of usury, he departed from the question put to him, which admitted only of an affirmative or a negative answer ; and it was wholly immaterial whether it was the one or the other. " I view," said the learned judge, " the appellant's answer charging usury as insisting on a distinct fact by way of avoidance. The respondent having replied, and given him an opportunity to prove the fact, and he having failed to do so, his answer is no evidence of the fact." Chancellor Kent considers this decision as carrying the doctrine, denying the answer to be evidence, to its most unre-

stricted extent. 2 *Johns. Ch. R.* 93, *note.* It seems to proceed upon two grounds : 1st. that the allegation replied to was unnecessarily inserted in the bill; and 2d. that the answer departed from the question, and set up a distinct fact in avoidance of the transfer of the note. The last was the principal ground of the decision, and points out a distinction which must, I think, control our decision on this part of the case. Has the respondent here departed from the questions he was bound to answer, and set up matter in avoidance of the appellant's claim? Would a simple negative or affirmative answer, as to whether the stock was or was not pledged for the loan of $500, have been all the appellant could have required of him? He was required to answer to the premises of the bill. Whether he has gone beyond what he was required to do, may be tested, I think, by supposing an interrogatory inserted in the bill, pointing to the very matter which he has answered, and he had refused to answer; would the court have compelled an answer? Interrogatories are not a necessary part of the bill; nor are they to be answered, unless they are such as are warranted by the premises or the allegations of the bill. *Redesdale's Treat.* 44. If the respondent had stopped after denying that the stock was pledged for the loan of $500, and refused to answer an interrogatory as to the amount for which it was pledged, because such an interrogatory was not warranted by the bill, there would have been, it appears to me, very little difficulty in shewing the answer to be insufficient. The bill seeks a disclosure, not only of the pledge, but of the attendant circumstances. The sum for which it was made is a most important fact connected with the transaction of the pledge. If, then, the respondent answers in relation to the premises of the bill what the appellant could have required him to answer by an interrogatory, the answer must necessarily be regarded as responsive to the bill. Again, I may ask, what was the object of the suit? Not merely to ascertain the simple fact whether the pledge was for the loan of $500; it was to procure a decree for the transfer of the stock. The defendant is bound to admit or deny the facts stated in the bill, with all their material circumstances, with-

ALBANY,
Dec. 1830.

Dunham
v.
Jackson.

out special interrogatories for that purpose. *Coop. Pl.* 11. 1 *Johns. C. R.* 75. The amount for which the stock was held by the respondent was a material circumstance. When he acknowledged the pledge of the stock as he was required to do, he was bound to shew the nature and extent of it, to the end that a decree might be made for its redemption. Stating the fact that it was pledged for $1300, instead of $500, was only disclosing a part of the transaction, and cannot therefore be regarded as distinct and new matter set up in avoidance of the equity admitted by the respondent, or made out by the appellant. I come to the conclusion that the answer establishes the fact that the stock was held in pledge for $1300,64.

We are next to inquire if there was a sufficient tender of this sum before the bill was filed. The facts relied on to make out the tender are those which took place when Dunham and Tracy were present. There was then an offer to pay the amount for which the stock was pledged by Mr. Tracy's check. He took from his pocket a blank check, and was about to fill it up for the proper sum when the respondent asserted a claim for the full value of the stock, which was considered to be worth at that time about $2000. If the respondent had not insisted upon what it is not now pretended he had a right to, the stock would probably have been then redeemed; but enough was not done, it is thought to constitute a legal tender. I have looked at the cases referred to on the argument on the subject of a tender, and I find not one among them that goes quite so far as we should be obliged to go in pronouncing what occurred upon this occasion a sufficient tender. There is a *nisi prius* case in 2 *Carr. and Payne*, 77, where it was held that an offer by a third person to go up stairs and get the sum which the defendant said he was willing to give the plaintiff, and the plaintiff replying that it was unnecessary to do so, for he would not take it, was sufficient proof to sustain a plea of tender for that sum. There has been, and I think very properly, some relaxation of the rigid rules in relation to making a tender; but if the effect of this relaxation is to render it a matter of uncertainty what shall constitute a tender, nothing will have been gain-

ed by it. Rigid rules are, upon the whole, better than un-
certain ones. In *Thomas* v. *Evans,* 10 *East,* 101, the king's
bench decided that to make a legal tender, "the actual pro-
duction of the money due, in monies numbered, is not neces-
sary, if, the debtor having it ready to produce and offering to
pay it, the creditor dispenses with the production of it at the
time, or do any thing which is equivalent to that." The
equivalent act spoken of by Lord Ellenborough is something
more, it would seem, than a bare *refusal* to receive the mon-
ey proposed to be paid, because the sum was not large
enough ; for that was done by the creditor in that case, and
yet the tender was held to be insufficient. Ch. J. Dallas, in
charging the jury in *Kraus* v. *Arnold,* said that "to consti-
tute a legal tender, the money must be actually produced, un-
less the plaintiff dispenses with the tender by expressly say-
ing the defendant need not produce the money, as he would
not accept it." This decision was confirmed by the English
common pleas. 7 *Moore,* 59. 17 *Com. Law R. S. C.* 70.
There is, in the facts of the last case, a striking resemblance
to those in the case now under consideration. The agent of
the defendant offered to pay the clerk of the plaintiff's attor-
ney £7 12s., saying that one *Tinson* had the money for that
purpose ; but the clerk demanded £8. Tinson was present,
and put his hand in his pocket to take out his pocket-book
to pay the £7 12s. ; but the agent of the defendant desired
him not to do so, as £8 were demanded. The court said
the money should have been produced, for the clerk might
have been tempted to take it. It is to be observed, that in
both the cases to which I have referred, the circumstance
of demanding more than it was proper to pay was not con-
sidered an act equivalent to dispensing expressly with the
production of the money. We must say in this case, unless
we deny the law which was applied to those cases, that the
actual production of the money was not dispensed with ; nei-
ther money nor a check was tendered ; and although a bro-
ker was present, who was willing to give his check for the
sum to be paid, I am afraid it would be innovating upon well
established principles to hold that this amounted to a tender.

I am obliged therefore to adopt the conclusion to which the chancellor came on this point. The tender was not made out.

There was a question on the argument as to what should have been the decree, admitting that it must be against the appellant. Should it have been, as it is, a decree for a foreclosure, if the appellant did not redeem within a specified time, or should the bill have been dismissed? If the dismissal of a bill to redeem, after a hearing upon the merits, operates as a bar to any future claim to redeem, then a decree of dismissal, where there is a right to redeem, would be erroneous. That such would have been the effect of a dismissal of the appellant's bill. I think is established by the case of the *Bishop of Winchester* v. *Paine*, 11 *Ves.* 199. Lord Eldon says, that " If a bill filed by a mortgagor for redemption is dismissed, the money not being paid at the time, that operates as a foreclosure, and is equivalent to a decree of foreclosure." " The equity of redemption," says Chancellor Kent, " may be foreclosed by the act of the mortgagor himself; for upon a bill to redeem, the plaintiff is required to pay the defendant by a given time, which is usually six months after the liquidation of it; and upon his default, the bill to dismissed for non-payment, which is a bar to a new bill, and is equivalent to a decree of absolute foreclosure." 4 *Kent's Comm.* 179. The appellant had an undoubted right to redeem on paying the $1300,64. A decree, therefore, which should have denied her that right *in this suit*, and would have operated as a bar to her right on another bill or in a suit at law, would have been unjust. I think the decree for a foreclosure, unless the appellant came in and redeemed within the time mentioned therein, was correct.

I regret, however, that the respondent was allowed costs. His unwarrantable conduct in seeking to retain the stock on a claim for which it was never pledged, prevented undoubtedly a redemption; but as costs are so much in the discretion of the chancellor that an appeal can never or rarely be sustained, on his decision relating to them, it would not be correct perhaps to modify the decree in this respect. If, however, the consideration which in my judgment should have withheld costs from the respondent in the court below, could

properly be permitted to influence our decision on the question of giving costs on this appeal, I would most readily yield to it.

This being the unanimous opinion of the court, with the exception of a single member, the decree of the chancellor was thereupon *affirmed,* but *without costs.* On the question of costs, the members were divided; 5 being for, and 12 against allowing costs.